

## AFFIDAVIT OF SPECIAL AGENT DEREK M. DUNN

I, Derek M. Dunn, being duly sworn, hereby depose and state as follows:

### INTRODUCTION

1.  I am a Special Agent with United States Immigration and Customs Enforcement ("ICE"), and have been so employed since April 2003. Prior to becoming a Special Agent with ICE, I worked with the United States Customs Service as a Regulatory Auditor for seven years and nine months. I am currently assigned to the New England High Intensity Drug Trafficking Area Financial Task Force. Since April 2003, I have conducted and assisted in several money laundering and drug trafficking investigations. I have received specific training regarding these crimes during my tenure as a Special Agent.

2.  I am submitting this affidavit in support of a criminal complaint charging Amaro Millan ("Millan"), with money laundering (that is, conducting a financial transaction, to wit, wire transfers, involving property represented to be the proceeds of a specified unlawful activity, to wit, narcotics trafficking, with the intent to promote the carrying on of a specified unlawful activity, to wit, narcotics trafficking, and with the intent to avoid a transaction reporting requirement under federal law, and with the intent to conceal and disguise the nature, location, source, ownership, and control of the cash believed to be the proceeds, in violation of 18 U.S.C. § 1956 (a)(3); and charging Millan and Orlando Alicea ("Alicea") with conspiracy to possess with intent to distribute cocaine, a Schedule II substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and in support of obtaining a search warrant on the cellular telephone of Alicea. For the reasons set forth hereinafter, I submit there is probable cause to believe Millan and Alicea have committed the said violations in the District of Massachusetts, and that the cellular telephone of Alicea was used in the commission of these violations, and that evidence of the violations, fruits of the violations, and contraband will be found in that cellular telephone.

3.  I have included in this affidavit only those facts that I believe establish the requisite probable cause for the issuance of the requested complaint and search warrant. These facts are either personally known to me, or have been related to me by other federal, state, or local law enforcement officers or employees. The investigation is still ongoing. The information contained in the Affidavit is submitted for the sole purpose of supplying probable cause for the issuance of the requested complaint. Accordingly, this Affidavit does not contain all of the information known to me or other agents regarding this criminal investigation. Moreover, the conversations described herein took place primarily in Spanish. According, the descriptions of conversations, including quoted items, necessarily include paraphrases or translations of the comments made by the individuals.

## FACTS AND CIRCUMSTANCES

### A. Money Laundering Transactions by Amaro Millan

4.  On November 4, 2003, a cooperating witness, whose reliability has been previously established by law enforcement agents ("CW"), met with Millan in Multiservices Tuyas, 88 West Elm Street, Brockton, Massachusetts, (the "Target Premises"). Prior to the meeting, the CW was provided with a digital recording device and a transmitting device. The meeting was recorded and monitored by law enforcement agents, and the CW was debriefed after the meeting.

5.  During this November 4th meeting, Millan and the CW discussed how to send money to Colombia from the United States. Millan explained that according to wire transfer regulations, the maximum amount an individual could wire without being required to present identification was United States Dollars ("USD") $1,499. With an acceptable form of identification, Millan stated that the individual could send up to USD $2,999. Millan explained further that in order to wire quantities of money exceeding the aforementioned limits the CW

would have to provide Millan with at least four or five different names both locally and in Colombia.

6. Millan further stated during this November 4th meeting that the CW should not send all of the money at once. Millan recommended the transactions be conducted over the course of a week so nobody would get "burned." Millan further emphasized the telephone numbers provided should correspond to each name or at the very least, a different person should answer at each number since the "companies" randomly call to verify the validity of transactions. The CW understood that "companies" referred to the main wire remitting companies for which Millan was an agent.

7. On March 3, 2004, the CW met with Millan in the Target Premises, in a meeting that was consensually recorded. During this meeting, the CW provided Millan with USD $5,000 of official government funds (OGF) to wire to Colombia with the names of two recipients. Millan sent two wire transfers totaling USD $2,000 and assessed a total fee of $80 (normal wire transfer fee of 4%). Millan gave the CW a wire transfer receipt corresponding to each of these transactions. Millan asked the CW to provide a separate name for every $1,000 wired to Colombia.

8. During this March 3rd meeting, Millan asked the CW if he/she had something for him. The CW understood Millan to be referring to narcotics. Millan stated he could move about "5 to 7 weekly," and further discussion ensued. [See Section B, infra.]

9. During this March 3rd meeting, Millan stated another way to get money to Colombia would be to set up bank accounts both here and in Colombia, and Millan also suggested flying to Colombia would be less expensive. The CW asked Millan if he would be interested in traveling to Colombia. Millan stated he would travel but would have to take about 2-3 people so together they could transport between USD $20,000 - $30,000. Further, Millan told the CW he/she would

3

have to purchase his ticket as well as those of his wife and children so together they could transport USD $40,000.

10. On March 15, 2004, the CW met with Millan in the Target Premises. During this meeting, Millan told the CW to bring $5,000 on Friday (March 19, 2004) to ensure it arrived by Monday (March 22, 2004).

11. On July 13, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan asked if the CW had "anything" to sell. The CW understood Millan to be referring to narcotics. The CW responded he/she did not like to get involved in that business because the business of its proceeds was more lucrative. The CW provided Millan with USD $2,000 to wire. Millan stated he could send the $2,000 in separate wire transfers using two separate pairs of names (senders and beneficiaries). Millan sent two wire transfers totaling USD $2,000 and assessed a total fee of $80. Millan gave the CW a wire transfer receipt corresponding to each of these transactions. Millan told the CW to use the same last names for the senders and beneficiaries to give the appearance that both parties are family members. Millan also told the CW to make up any address for the sender such as "an old address or anything." Millan stated he needed a list of names of senders and beneficiaries with matching last names. In addition, Millan told the CW not to send all the money to Bogota because not everyone who comes to his business sends to Bogota. During this July 13th meeting, Millan further stated that he could send larger quantities but would charge higher commissions. Millan stated he could not send too much money too quickly because it would look suspicious. During this meeting, Millan stated he would talk to a friend from East Boston who also could help the CW. Millan told the CW to take the money to the woman in East Boston. He said the CW could leave, for example, $10,000 at the beginning of the week. The woman could then, through the course of the week, wire transfer the money and the CW could pick up receipts at the end of the

4

week. Millan said she could more easily wire a larger quantity because she was centrally located (in East Boston) and handles a lot more wire transfers.

12. The next day, on July 14, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, Millan stated that they had only sent $1,000 the day before, and that today he wanted to send $1,400. Millan read the regulations to the CW concerning wire transfers over $1,500 as follows:

> "As of July 20, 2004, all wires equivalent to or greater than $3,000, the remitter will demonstrate the origin of the funds with documents such as bank receipts, pay stubs, real estate sales, or any other document that demonstrates the legal origin of such funds that are being wired."

After reading this provision, Millan asked the CW to sign each wire transfer differently. Millan told the CW he did not want all of the addresses going to Bogota nor did he want cell phone numbers as the contact number on the wire transfers. Millan said most of his wires to Bogota are for smaller amounts. While completing the wire transfer receipts, Millan told the CW he was changing the name of one of the senders to make her look like a family member of the recipient. Millan sent two wire transfers totaling USD $2,400 and assess a total fee of $96. Millan gave the CW a wire transfer receipt corresponding to each of these transactions. During this meeting, Millan asked if the CW was a "Fed" because the CW had excuses for everything.

13. During this July 14th meeting, the CW reminded Millan it was urgent to get this money down before receiving a shipment, referring to a shipment of drugs. Millan said "sell me some. Get me some . . . once you bring some, get me some . . . two or three and I'll buy them from you."

14. On July 16, 2004, the CW met with Millan in the Target Premises. During this meeting, Millan referred to the woman in East Boston as "Dona Rosa," later identified as Margarita Rosa Celorio. Millan told the CW the name of Dona Rosa's business was Maverick

Square Communications located in Maverick Square. Millan told the CW if Celorio was going to work (sending wire transfers), she would want to start today. Millan called Celorio and advised her the CW would be coming to her business that afternoon. Millan did not accept the funds the CW brought in for the July 16th meeting, and instead, told the CW to return to the Target Premises after meeting with Celorio so he could wire the money.

15. On July 16, 2004, the CW placed two consensually recorded telephone calls to the Target Premises. During the first conversation, Millan asked the CW to call him back in a few minutes because he "needs money." Shortly after, the CW once again called Millan at the Target Premises. The CW asked Millan what money he had referred to in the last conversation. Millan responded "Didn't you say you would be sending money to the woman?" Millan ended by saying "Put in some water and wash it well."

16. On July 17, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan accepted the $5,000 in funds to be wired to Colombia. Millan wired the amount as follows:

```
07/17/04    $1,400
07/19/04    $1,000
07/20/04    $1,400
07/22/04    $1,000
```

He had used the remaining $200 to pay for the wire transfer fees.

17. During this July 17, 2004 meeting, Millan informed the CW he would wait until another customer came in before sending the CW's wires. Millan added he had been expecting the CW to return the day before. The CW asked Millan how much money he could wire daily. Millan suggested the CW leave money once a week for him to wire. Millan said that he did not want to commit to a specific amount or run any risks. Millan told the CW to leave the money and he would wire it in different amounts. Millan said he could send wires to the same person

utilizing two different names. Millan asked the CW to bring him more money on Monday (July 21, 2004).

18. Still during this July 17th meeting, Millan said that he was interested in what the CW would be receiving, and a discussion about drugs ensued. [See Section B, infra.]

19. During the same July 17th meeting, Millan told the CW he did not have many clients that send money to Bogota. He mostly sends wires to Cali or Medellin. Millan said he only has two honest customers that actually wire money to Bogota. He further stated, that each only wire money on the first of the month. During the same meeting, Millan again raised the issue of Celorio, the woman he had referred to in East Boston. Millan stated that Celorio might tell the CW to leave about $15,000 that she would wire over the course of three to four days. Millan suggested that the CW take Celorio $10,000 since she might be able to wire it by that Monday, July 21, 2004.

20. On July 17, 2004, the CW met with Celorio. While the CW was in Celorio's business, Millan called asking whether the CW was there. During this meeting, which was consensually recorded, Celorio stated that Millan had called her in reference to the CW and sending money for the CW. Celorio stated that she would call Millan with a fixed sum that she could wire for the CW per week.

21. On July 20, 2004, the CW met with Millan in the Target Premises. The meeting was consensually recorded and monitored by law enforcement agents. During this meeting, Millan obtained $200 from the CW and stated this money was for him. When the CW inquired if the $200 were accepted to pay for wire fees owed, Millan stated these were for him, separate from the regular 4% fee. Millan completed a wire transfer in the CW's presence. During this meeting, Millan told the CW that Celorio had told Millan that she could start with $10,000 per

week to be wired. Millan also told the CW that Celorio had told Millan to be wary of people like the CW, implying that the CW worked for the government.

22. On July 23, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan accepted the $200 to cover the remaining transaction fees. Millan also accepted $5,000 in funds to be wired to Colombia and $200 in corresponding fees. Once again, Millan asked for an additional $200 in extra commissions for him to be brought to the next meeting. He explained that the $200 he received today would be included in the next wire transfer. Millan wired the funds as follows:

```
07/23/04    $1,200
07/26/04    $1,000
07/27/04    $1,000
07/28/04    $1,000
```

Law enforcement agents learned that of the moneys paid to Millan on this date, only $4,200 was wired. Millan told the CW that an additional $1,000 had been wired but he had left the wire transfer receipt at home. However, as of the date of this affidavit, these funds were neither wired nor returned to the CW by Millan.

23. Also during this July 23rd meeting, Millan told the CW to take some money to Celorio to be wired. Millan told the CW to tell Celorio that it was the CW's own money in order to avoid any complications.

24. On August 5, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, the CW asked Millan if he wanted him/her to bring more money to be wired. Millan asked the CW to take him money the following day. MILLAN reminded the CW an extra $200 was owed to him for a previous transaction in addition to $400 for the new transaction. Millan again requested addresses from different cities in Colombia be provided.

25. On August 6, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan accepted the $200 to cover the last

transaction's extra commissions. Millan also accepted $5,000 in funds to be wired to Colombia, $200 in corresponding fees, and an additional $200 as his extra commission. Millan wired the amount as follows:

| | |
|---|---|
| 08/06/04 | $1,200 |
| 08/09/04 | $1,150 |
| 08/11/04 | $2,850 |

26. During the August 6th meeting, Millan told the CW not to save any of the receipts. He stated he was telling the CW this because he trusted the CW. Millan informed the CW he would use addresses from previous transactions if needed. He further stated the only addresses he has repeated are those located in Bogota.

27. On August 10, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan stated he had two extra sender's addresses that he would use instead of the Revere addresses the CW provided. He said the Revere addresses should be given to Celorio.

28. On August 13, 2004, the CW went to Target Premises, and in a consensually recorded meeting with Millan, Millan accepted the $5,000 in funds to be wired to Colombia and $200 in corresponding fees. Millan informed the CW he/she was up-to-date with the extra commissions. The additional $200 extra commission due for today's transaction could be paid in the form of prepaid phone cards the following meeting. Millan wired the amount as follows:

| | |
|---|---|
| 08/17/04 | $1,200 |
| 08/19/04 | $1,000 |
| 08/20/04 | $1,000 |
| 08/20/04 | $ 900 |
| 08/23/04 | $ 900 |

Millan informed the CW he had asked a friend to use his ID in order to send a wire in an amount over $1,500 (August 11, 2004). Millan asked the CW to return on Monday (August 16, 2004) with a list of recipient's addresses in cities other than Bogota. He stated such a high volume of

wires destined for Bogota – when one has not moved that much to Bogota – would look suspicious.

29. On August 17, 2004, the CW met with Millan in the Target Premises. Prior to the meeting, the CW was provided with USD $100 in official government funds, and $100 worth of prepaid phone cards. The meeting was recorded and monitored. During this meeting, Millan accepted the $100 in prepaid cards and $100 cash to cover the last transaction's extra commissions.

30. On August 24, 2004, the CW met with Millan in the Target Premises, and the CW told Millan (while consensually recording the conversation) that he/she was going to Miami to meet with a chemist to discuss the delivery of a liquid that produces a white substance. Millan told the CW to let him know if he/she should happen to come across any good "grass." He also said "good grass" from the country could make good money. Millan further stated if the CW did obtain some "grass" maybe "70, 100, 200 . . . it can be passed hand to hand."

31. On September 1, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, Millan accepted $5,000 in funds to be wired to Colombia, $200 in corresponding fees, and an additional $200 as his extra commission. Millan wired the amount as follows:

```
09/02/04    $1,200
09/04/04    $1,000
09/07/04    $1,000
09/08/04    $1,000
09/10/04    $ 800
```

Millan stated he was required to obtain identification from anyone sending wire transfers. Millan stated he would take extra money depending on the destination. Millan asked the CW if he/she had brought anything back for him from Miami, which the CW and law enforcement agents understood to refer to narcotics. The CW stated he/she has had problems with people

who request drugs, but then do not want them. Millan assured the CW if he requests "5 or 10," it is because he can sell them.

32. On September 11, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, Millan accepted $5,000 in funds to be wired to Colombia, $200 in corresponding fees, and an additional $200 as his extra commission. Millan wired the amount as follows:

```
09/13/04    $1,000
09/14/04    $1,000
09/15/04    $1,000
09/17/04    $1,200
09/18/04    $ 800
```

33. On September 17, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, Millan accepted $5,000 in funds to be wired to Colombia, $200 in corresponding fees, and an additional $200 as his extra commission. Millan wired the amount as follows:

```
09/17/04    $1,200
09/18/04    $1,000
09/20/04    $1,400
09/21/04    $ 700
09/22/04    $ 700
```

Millan warned the CW not to give him any names that were being used anywhere else.

34. Also during this September 17, 2004 meeting, Millan told the CW if he/she can get "four a week" (which the CW understood to refer to four kilos of cocaine), the CW would not have to make many trips, and a discussion about drugs ensued. [See Section B, infra.]

35. On September 20, 2004, the CW placed a consensually recorded telephone call to Millan. During the conversation, the CW asked Millan if he wanted him/her to stop by early Wednesday (September 22, 2004) morning so Millan could assist in "filling out more forms." Millan said yes.

36. On September 22, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, Millan accepted $5,000 in funds to be wired to Colombia, $200 in corresponding fees, and an additional $200 as his extra commission. Millan wired the amount as follows:

| | |
|---|---|
| 09/23/04 | $ 800 |
| 09/23/04 | $1,000 |
| 09/24/04 | $ 900 |
| 09/25/04 | $1,200 |
| 09/27/04 | $1,100 |

Millan asked the CW to increase the amount to $10,000 next time.

37. On September 30, 2004, the CW met with Millan in the Target Premises. During this meeting, Millan accepted $10,000 in funds to be wired to Colombia, $400 in corresponding fees, and an additional $400 as his extra commission. Millan wired the amount as follows:

| | |
|---|---|
| 09/30/04 | $ 800 |
| 10/01/04 | $ 900 |
| 10/01/04 | $ 900 |
| 10/04/04 | $ 600 |
| 10/04/04 | $ 800 |
| 10/06/04 | $1,200 |
| 10/08/04 | $1,000 |
| 10/09/04 | $ 700 |
| 10/09/04 | $ 900 |
| 10/09/04 | $ 800 |
| 10/11/04 | $ 700 |
| 10/12/04 | $ 700 |

Millan stated he would wire varying quantities to avoid having the transactions looking suspicious. Millan asked the CW why all the money ($10,000) was in 20 dollar bills. The CW told Millan he/she had been unable to exchange the money to larger bills. Millan said he could obtain about 10-15 cell phone numbers to send wire transfers. Millan offered to go to several money remitters and wire about $1,000 from each. Millan later offered to hire a man to do this. Millan said he wanted to earn extra money and wanted the man to earn some money too. Millan stated he wanted to use the man because he knew him well. Millan informed the CW he was

going to inquire with the management at Banco de Bogota to determine if it would be a problem

for Millan to deposit $80,000. If there were no problem, the CW could deposit the money into

the bank branch in Miami then Millan would fly to Colombia where he would withdraw the

funds. Millan said he could also write checks.

38. On October 15, 2004, the CW met with Millan in the Target Premises. During the

meeting, which was consensually recorded, Millan accepted $10,000 in funds to be wired to

Colombia, $400 in corresponding fees, and an additional $400 as his extra commission. Millan

wired the amount as follows:

| | |
|---|---|
| 10/15/04 | $1,000 |
| 10/16/04 | $ 800 |
| 10/16/04 | $ 900 |
| 10/19/04 | $ 800 |
| 10/19/04 | $ 700 |
| 10/21/04 | $ 800 |
| 10/22/04 | $ 900 |
| 10/25/04 | $ 600 |
| 10/25/04 | $ 600 |
| 10/28/04 | $ 600 |
| 10/28/04 | $ 600 |
| 10/29/04 | $ 900 |
| 10/30/04 | $ 800 |

39. On October 18, 2004, the CW met with Millan in the Target Premises. During this

consensually recorded meeting, Millan read a list of cities in Colombia to the CW. He suggested

the CW provide recipients in those various areas where the remitting company had offices.

Millan also requested a list of names from varying Colombian cities for the CW's wire transfers.

40. On October 25, 2004, the CW met with Millan in the Target Premises. During this

meeting, which was consensually recorded, Millan told the CW to bring him more money the

following day. The CW responded he/she would not bring more money until Friday (October

29, 2004). Millan stated he wanted to use the extra commissions to open a new bank account.

They agreed the CW would bring another $10,000.

41. On October 28, 2004, the CW met with Millan in the Target Premises. During this consensually recorded meeting, Millan accepted $10,000 in funds to be wired to Colombia, $400 in corresponding fees, and an additional $400 as his extra commission. Millan wired the amount as follows:

| | |
|---|---|
| 11/01/04 | $ 800 |
| 11/01/04 | $ 800 |
| 11/02/04 | $1,200 |
| 11/04/04 | $ 700 |
| 11/06/04 | $ 800 |
| 11/06/04 | $ 700 |
| 11/06/04 | $ 600 |
| 11/08/04 | $ 700 |
| 11/09/04 | $ 500 |
| 11/10/04 | $ 900 |
| 11/11/04 | $ 600 |
| 11/12/04 | $ 900 |
| 11/16/04 | $ 800 |

Millan told the CW to be patient because he sends money whenever he can. Millan prepared some wire transfers and asked the CW to sign them.

42. On November 5, 2004, the CW met with Millan in the Target Premises. During the meeting, Millan stated he wanted a list of new (recipient) names from different cities but not small towns (in Colombia). Millan said he did not like keeping all the wire transfer receipts in the Target Premises. He told the CW to take them, confirm them with his/her people, and then tear them up.

43. On November 6, 2004, the CW met with Millan in the Target Premises. During the meeting, which was consensually recorded, Millan asked the CW to sign some wire transfers. Also during this meeting, the CW asked Millan how much the "material" was going for. Millan said he thought it was going for "21," referring to drugs. The discussion that followed is set forth in Section B, infra.

44. On November 22, 2004, the CW met with Millan in the Target Premises. During the meeting, which was consensually recorded, Millan stated his remitting company could receive money in other countries not just Colombia. He said they have the means to do it in places such as the Dominican Republic, Ecuador, Peru, etc. During this meeting, the CW informed Millan the "stuff" was in the Dominican Republic now, referring to the drugs discussed previously. This conversation that followed is discussed in Section B, infra.

### B. Conspiracy to Possess with Intent to Distribute 10 kilograms of Cocaine

45. During the March 3, 2004 meeting referred to above, which was consensually recorded, Millan asked the CW if he/she had something for him. The CW believed Millan referred to narcotics. Millan stated he could move about "5 to 7 weekly." He asked the CW to bring some to him and he would pay for it on the spot. Millan went on to describe the type of quality he wanted as "white and with shine." The CW explained he/she recently had a shipment stuck in the Dominican Republic since the door here was "closed." The CW was told the door had reopened and he/she would try once again. The CW informed Millan he/she needed to send funds to Colombia in order to buy some again. The CW asked Millan how much it was going for. Millan stated it was going for about "21." He stated one of his longtime friends, a Dominican, was selling it "white and shiny" and that this product "comes in 2 bars, sealed . . . ."

46. During a consensually recorded meeting on July 13, 2004, Millan asked if the CW had "anything" to sell. The CW believed Millan referred to narcotics. The CW responded he/she did not like to get involved in that business because the business of its proceeds was more lucrative.

47. A few days later, on July 17, 2004, in a consensually recorded meeting on the Target Premises, Millan said that he was interested in what the CW would be receiving, and the CW understood this to be a reference to drugs. Millan said that it was not for him but for a friend.

The CW explained the money was to be sent to pay for a shipment of heroin. Millan also said that he knew someone, one of his clients, interested in heroin. He described the man as someone with much money whom no one would suspect. Millan said the minimum the man buys is "5," referring to five kilograms. Millan also advised the CW that one can get "sin semilla" at a good price. Millan clarified and said he was referring to "weed." Millan explained the high profits associated with selling that drug and the low risks involved such as the practically non-existent penalties if caught.

48. On August 24, 2004, the CW met with Millan in the Target Premises. During this meeting, which was consensually recorded, the CW told Millan he/she was going to Miami to meet with a chemist to discuss the delivery of a liquid that produces a white substance. Millan told the CW to let him know if he/she should happen to come across any good "grass." He also said "good grass" from the country could make good money. Millan further stated if the CW did obtain some "grass" maybe "70, 100, 200 . . . it can be passed hand to hand."

49. On September 1, 2004, the CW had a consensually recorded meeting with Millan in the Target Premises. Millan asked the CW if he/she had brought anything back for him from Miami. The CW understood Millan to be referring to narcotics. The CW stated he/she has had problems with people who request drugs and then do not want them. Millan assured the CW if he requests "5 or 10," it is because he can sell them.

50. On September 17, 2004, in a consensually recorded meeting between the CW and Millan in the Target Premises, Millan told the CW if he/she can get "four a week," the CW would not have to make many trips. The CW understood this to mean four kilograms of cocaine. Millan also stated that his friends are tired of dealing with the Dominicans. Accordingly, Millan indicated that the CW would only have to bring the packages to the Target Premises and Millan

would call his friends and check out the product. If the quality was good, his friends would leave the money and take the packages.

51. On November 6, 2004, in a consensually recorded meeting, the CW asked Millan how much the "material" was going for. Millan said he thought it was going for "21." The CW stated that there might be "an opening again" and that the stuff would go from "Bogota to the island to here," meaning from Colombia to the Dominican Republic to the United States. Millan responded that if the CW had an opening, he would get buyers. As long as it was the good stuff, he would do it.

52. On November 22, 2004, the CW informed Millan, during a consensually recorded meeting at the Target Premises, that the "stuff" was in the Dominican Republic now. The CW had asked for "10" to be brought here. Millan stated the guy that was interested was "around." The CW stated he/she was confident in receiving the "stuff."

53. On December 1, 2004, the CW met with Millan in the Target Premises. During the meeting, which was consensually recorded, the CW told Millan "they were close." The CW referred to the shipment of narcotics. Millan responded, "(I) am awaiting that."

54. On December 3, 2004, the CW met with Millan in the Target Premises. During the consensually recorded meeting, the CW said some material would be arriving soon, referring to a shipment of drugs. Millan expressed interest as long as the price was good and the "material" was good. Millan told the CW to ask the owners what the price was, and then the CW should tell Millan. Millan told the CW "it's going for twenty," which the CW understood as a reference to the price in thousands of dollars per kilogram of cocaine. Millan spoke about one of his clients and indicated that he was obtaining "his" (which the CW understood to refer to his narcotics) from Dominicans. Millan stated this contact "every so often he used to let me earn a buck." Millan told the CW "before we move forward . . . , it has to be white and shiny . . . it has to be

white and it has to shine because it's for 'gringos.'" The CW asked Millan if the materials used in the preparation process were making it white again. Millan responded, "no, there were problems but they are obtaining it more original."

55. This consensually recorded meeting on December 3, 2004 continued with Millan stating that because he trusted the CW he was going to introduce him/her to his nephew so they could negotiate directly. Millan called his nephew in the CW's presence and asked him to come to the business to meet the CW, whom he had spoken to him about before. He asked the nephew to come before he closed the store.

56. During this same December 3rd conversation, the CW asked Millan if they should increase the price, referring to the wholesale price, in order for Millan and the CW to earn a commission. Millan responded "I'm telling you now how much he's paying for it so we don't play the role of idiots either." Millan stated, "that's why you already know how much he's getting it for so you can obtain it within a range we can earn . . . "

57. The CW told Millan his/her contacts would bring it to him/her. Millan said, "and I assure you I can move it . . . as long as the price is good . . . and the material is good . . . I have two clients that at any time I can tell them . . . and they'll buy . . . yeah?" Millan told the CW he had a client who owned a gas station and "he would always take 10 . . . but like that (snapping his fingers) . . . and he would come and leave me the money up front . . . ." The CW told Millan to begin talking to his clients. Millan said they first had to talk "since they all know each other." Millan reminded the CW he did not want to communicate about these things over the phone.

58. On December 10, 2004, the CW met with Millan in the Target Premises, where Millan discussed the potential drug deal. During the consensually recorded meeting, Millan stated, "and now the nephew keeps bothering me because he was in need of . . . ." The CW stated by way of explanation that the shipment was not his/hers. The CW told Millan his/her

acquaintances had already sold their shipment. The CW explained that the shipment had been pre-ordered. The CW said he/she had spoken to them and expressed Millan's interest. The CW reported that they had told the CW they would be in town the following week and could meet Millan. Millan also stated, "the thing is we can not take our clients to the man because . . . if we take them to the man we might lose them." The CW responded by suggesting that they go instead. Millan responded, "no, and in addition the nephew told me . . . he called me and said, what happened? Did something happen to the guy? And I told him no, nothing happened I just haven't seen him. And then once we spoke, I called him and I spoke to him. I told him you had resuscitated and he told me, well talk to him and . . . ."

59. The CW told Millan that his/her contacts had told him the last shipment was an order. Millan said the other one he knew was a Dominican that could also move it. However, Millan said he does not have the same trust with the Dominican as he does with his nephew. Millan said the Dominican was the type that would take one out of the middle or jump over them and leave them out. The CW stated he/she knew his/her contacts would not cut him/her out, and that the the CW's contact had told him/her the advantage to ordering ahead was they would have the ability to negotiate the price. The CW stated further that their shipments were very rarely caught or encountered problems.

60. Millan said he would call his nephew tomorrow. Regarding commissions, the CW told Millan to talk to his nephew and agree on an amount and he/she would talk to his/her contacts and also agree on an amount. Millan said, "they'll help you and then you help me." The CW asked Millan how much he expected. Millan responded, "at least a 'peso' per package." The CW believed Millan referred to $1,000 per kilogram.

61. Millan stated his nephew and the Dominican were more involved in the "scene" therefore were more familiar with the prices. The CW told Millan he could also meet with his/her contacts. Millan said he would speak to his nephew and would call the CW.

62. On December 16, 2004, the CW met with Undercover Agents (hereinafter UCA or UCAs) and Millan's nephew, Orlando Alicea ("Alicea"). This meeting was consensually recorded. During this meeting, Alicea explained although they had expected to meet with Millan, he was his nephew and could be trusted. The UCAs informed Alicea how they conducted their business and the degree of caution used. The UCAs stated they had plenty of customers and were only doing this as a favor to the CW. The UCAs explained that the cocaine arrived once a month and was distributed to customers all in one day. Alicea was also told that it was all conducted with care and calmness. Alicea was informed that the UCAs were waiting for a load to arrive directly from Colombia. He was also told it was necessary to know in advance how much a client wanted. In coded fashion, Alicea was told the CDs (kilos of cocaine) were not "rap" but quality classic music (good quality).

63. During this December 16th meeting, the UCAs also told Alicea how they intended to conduct the transaction. They told him that the money and music (cocaine) would not be in the same location. Alicea was told that on the day of delivery, he would have to show the money prior to picking up the cocaine. He was further told that he would have someone stay with the CW and the cash while he went to examine and pick up the cocaine: once he examined the cocaine and was satisfied, he would call his associate to turn the money over to the CW and then he would be given the cocaine. The UCA then told Alicea the price was $20,000 per kilo. Alicea stated the price was too high. He said he planned to purchase ten kilos and was currently paying $20,000 for the purchase of one kilo. Alicea stated that his plan was to get several "DJs" (understood by the UCAs to refer to customers) to band together, and that he wanted a good

price so he could profit from selling to them. The UCA asked Alicea at what price he would feel comfortable paying for each kilo. Alicea said he had to consider his uncle, therefore he asked to be charged $17,000 per kilo. The UCA told Alicea $17,000 was too low. Alicea stated he and his people were paying $20,000 on the street, and he had to think of his uncle. He said they were involved with Dominicans and was not comfortable dealing with them.

64. Before the UCAs gave Alicea a price at this December 16th meeting, Alicea said he had a place in Boston where the cocaine could be delivered. He was told the UCAs did not deliver, but Alicea would need a vehicle to pickup the cocaine at the location the UCAs had rented. Alicea was told he would need a vehicle with a hidden compartment. He said he did not have one. Alicea stated he used his truck with the toolbox to transport his cocaine. Alicea stated he did not have a vehicle with a hidden compartment and did not want to pay Dominicans for a car to use. The UCAs offered to help, if needed, by asking someone if that person would allow the use of his vehicle. The UCA suggested Alicea could use his toolbox, located in the truck, by creating a space underneath the tools as Alicea had mentioned before.

65. UCA offered $18,000 as the price per kilo. Alicea stated he could if, with time, he would be kept in mind. He was told that in the future it would be easier to lower the price as long as he purchased more. UCAs told him the first time was always the most difficult. Alicea was told to take his time and think about it. He was advised that the next load would be arriving around the second week in January. The UCAs told him they would need to know by the following week, so the order could be placed. UCA told Alicea to take the weekend to think about it and discuss it with Millan. It was agreed by all that no more than ten kilos would be sold in the first deal. Alicea was told if he agreed to do the deal, there could possibly be another meeting to finalize the details.

66. In further discussions at this consensually recorded December 16th meeting, Alicea stated that most of his clients were people he knew and with whom he had grown up. Alicea said his uncle knew some of his customers. Alicea was asked if his uncle was going to be part of the deal, and Alicea responded that he had a percentage of it. Alicea stated he now felt comfortable and thought everything was fine. The UCAs replied they too felt comfortable with Alicea, as he seemed calm and serious. The UCA told Alicea since he was only buying ten kilos, $18,000 per kilo would be the best price. If in the future, he were to buy 20, they would consider $17,000. Alicea advised that for now $18,000 was fine, but that he hoped the UCAs would show some consideration in the future.

67. On December 18, 2004, the CW met with Millan in the Target Premises. During this meeting which was consensually recorded, Millan stated he would support his nephew on this deal. Millan agreed to the deal but stated he would speak to his nephew to confirm. He told the CW he would call him/her the following day with confirmation.

68. On December 19, 2004, Millan called the CW. This call was consensually recorded. Millan informed the CW he had spoken to his nephew and both agreed to the deal.

69. During a meeting on January 12, 2005, the UCA had further discussions with Millan and Alicea regarding the proposed cocaine deal. At the close of these discussions, an agreement was reached that the transaction would take place on Friday, January 14, 2005. At the close of this meeting, the UCA asked Alicea and Millan how they could contact them in advance of the meeting. Both Alicea and Millan provided numbers for cellular telephones that could be used to contact them in regard to the cocaine deal: (617) 592-9808 for Alicea, and (508) 292-2085 for Millan.

70. On January 14, 2005, consistent with the plan agreed to in the meeting on January 12, 2005 and subsequent telephone calls, a meeting took place to purchase the cocaine. As agreed

22

previously, Millan, Alicea, a UCA, and the CW met at Millan's place of business, and Millan showed the CW and a UCA that he had the cash to pay for the drugs. The money was in a box, and Millan pulled out one of several bundles, stating in essence "this is ten thousand, and there are 18 bundles here." After Millan showed that he had the cash, as agreed previously, the UCAs and Alicea went to a Brockton garage, where the UCAs showed Alicea the cocaine. Alicea cut one of the packages of cocaine and examined it for quality, after which he placed the bundles in a tool box, and placed the tool box in the large tool box that was already in the bed of his pickup truck.

71. After these events occurred, Alicea and Millan were arrested.

72. At the time of their arrest, Alicea was in possession of his cellular telephone, and the phone was in the "on" position. Following the arrest, law enforcement agents dialed the number provided by Alicea during the January 12, 2005, meeting with the UCAs, described above, and the telephone that was on Alicea's person at his arrest rang.

## CONCLUSION

Based upon the above information, and my own training and experience in this case, I believe that there is probable cause to believe that: (a) Amaro P. Millan has committed money laundering in violation of 18 U.S.C. § 1956 (a)(3), and that (b) Amaro P. Millan and Orlando Aliciea have conspired to possess with intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

CONCLUSION

Based upon the above information, and my own training and experience in this case, I submit that there is probable cause to believe that: (a) Amaro P. Millan has committed money laundering in violation of 18 U.S.C. § 1956(a)(3), and that (b) Amaro P. Millan and Orlando Alicea have conspired to possess with the intent to distribute cocaine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1). I further submit that there is probable cause to believe that Orlando Alicea used the subject telephone, cellular telephone 617-592-9808, to commit these crimes and that evidence of such crimes will found in this cellular telephone.

I declare that the foregoing is true and correct to the best of my knowledge and belief.

Derek M. Dunn
Special Agent
U.S. Immigration and Customs Enforcement

Subscribed and sworn to
before me this /4th day of
January, 2005

HON. CHARLES B. SWARTWOOD III
CHIEF, UNITED STATES MAGISTRATE JUDGE

JS 45 (5/97) - (Revised USAO MA 6/29/04)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:** Brockton, MA          **Category No.** _____    **Investigating Agency** ICE/FBI

**City** Brockton, MA               **Related Case Information:**

**County** Plymouth                 Superseding Ind./ Inf. _____    Case No. _____
                                    Same Defendant _____    New Defendant _____
                                    Magistrate Judge Case Number    MJ-05-1620-CBS
                                    Search Warrant Case Number _____
                                    R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   Amaro Millan                          Juvenile   ☐ Yes   ☒ No

Alias Name   _____

Address   _____

Birth date (Year only):   1940   SSN (last 4 #): _____   Sex  M  Race:   Hispanic      Nationality:  Colombia

**Defense Counsel if known:** _____    **Address:** 88 West Elm Street, Brockton

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  Nancy Rue                          **Bar Number if applicable** _____

**Interpreter:**   ☒ Yes  ☐ No       **List language and/or dialect:**      Spanish

**Matter to be SEALED:**   ☐ Yes  ☒ No

        ☐ **Warrant Requested**        ☐ **Regular Process**        ☐ **In Custody**

**Location Status:**

**Arrest Date:**    January 14, 2005

☐ **Already in Federal Custody as** _____    in _____ .
☐ **Already in State Custody** _____    ☐ **Serving Sentence**   ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   Ordered by _____    on _____

**Charging Document:**   ☐ **Complaint**    ☐ **Information**    ☐ **Indictment**

**Total # of Counts:**   ☐ **Petty** _____    ☐ **Misdemeanor** _____    ☒ **Felony**   1 Count

**Continue on Page 2 for Entry of U.S.C. Citations**

☒        I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
        accurately set forth above.

**Date:**                    **Signature of AUSA:**

🖉JS 45 (5/97) - (Revised USAO MA 3/25/02) Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant     Amaro Millan** _____

### U.S.C. Citations

| | **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
|---|---|---|---|
| Set 1 | 18 U.S.C. 1956(a) | Money Laundering | 1 |
| Set 2 | | | |
| Set 3 | | | |
| Set 4 | | | |
| Set 5 | | | |
| Set 6 | | | |
| Set 7 | | | |
| Set 8 | | | |
| Set 9 | | | |
| Set 10 | | | |
| Set 11 | | | |
| Set 12 | | | |
| Set 13 | | | |
| Set 14 | | | |
| Set 15 | | | |

**ADDITIONAL INFORMATION:**

JS 45 (5/97) - (Revised USAO MA 6/29/04)

**Criminal Case Cover Sheet**                     **U.S. District Court - District of Massachusetts**

Place of Offense: __Brockton, MA__    Category No. _____    Investigating Agency __ICE/FBI__

City __Brockton, MA__    **Related Case Information:**

County __Plymouth County__    Superseding Ind./ Inf. _____    Case No. _____
Same Defendant _____    New Defendant _____
Magistrate Judge Case Number    __MJ-05-1620-CBS__
Search Warrant Case Number    _____
R 20/R 40 from District of    _____

**Defendant Information:**

Defendant Name  __Orlando Alicea__    Juvenile    ☐ Yes    ☒ No

Alias Name _____

Address _____

Birth date (Year only): __1970__ SSN (last 4 #): _____ Sex __M__ Race: __Hispanic__ Nationality: __Colombia__

**Defense Counsel if known:** _____    Address: _____

**Bar Number:** _____

**U.S. Attorney Information:**

AUSA __Nancy Rue__    Bar Number if applicable _____

Interpreter:    ☒ Yes  ☐ No    List language and/or dialect: _____

Matter to be SEALED:    ☐ Yes    ☐ No

☒ Warrant Requested    ☐ Regular Process    ☐ In Custody

**Location Status:**

Arrest Date:    __January 14, 2005__

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____ ☐ Serving Sentence ☐ Awaiting Trial
☐ On Pretrial Release:  Ordered by _____ on _____

Charging Document:    ☒ Complaint    ☐ Information    ☐ Indictment

Total # of Counts:    ☐ Petty _____    ☐ Misdemeanor _____    ☒ Felony    2

**Continue on Page 2 for Entry of U.S.C. Citations**

☒    I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are accurately set forth above.

Date: _____    Signature of AUSA: _____

JS 45  (5/97) - (Revised USAO MA 3/25/02)  Page 2 of 2 or Reverse

**District Court Case Number  (To be filled in by deputy clerk):** _____

**Name of Defendant**    Orlando Alicea _____

## U.S.C. Citations

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1    21 U.S.C. Sec. 846 | Conspiracy | 1 |
| Set 2    21 U.S.C. Sec. 841 | Possession With Intent to Distribute Cocaine | 2 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**